The Honorable Richard A. Jones

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

TRITON AMERICA, LLC,

                                    Plaintiff,

              v.

WILEY DUCKETT, et al.,

                                    Defendants.

Case No. C10-00541RAJ

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

## I. INTRODUCTION

The court heard this matter in a bench trial that commenced on April 4, 2011 and concluded on April 7, 2011.  In this maritime contract and maritime tort case, Plaintiff Triton America, LLC ("Triton"), the operator of a dock located at the Skyline Marina in Anacortes, Washington, claims that Defendants Wiley and Beverly Duckett breached their moorage lease agreement and committed a maritime tort in negligently securing the headsail of their yacht, the SEA WY'S, thereby allowing it to unfurl during the night of December 14-15, 2006 and cause damage to Triton's dock.  The court has considered the testimony presented at trial, the exhibits admitted into evidence, and the arguments of counsel.  Being fully advised, the court now makes the following Findings of Fact and Conclusions of Law.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 1

## II.  FINDINGS OF FACT

**The Parties and Their Contractual Relationship**

1.  Triton is a Washington limited liability company and the owner of a dock at 1905 Skyline Way in Anacortes, Washington, on navigable waters of the United States.  The dock is within one bay of a multi-bay inlet of Puget Sound known collectively as Skyline Marina.  Tom Hsueh is the sole owner and managing member of Triton.

2.  Defendants Wiley and Beverly Duckett reside within this District and were at all material times the owners and operators of a 40-foot Hunter sailboat known as the SEA WY'S.

3.  The Triton dock was made of wood.  It consisted primarily of an 80-foot main pier with three 30-foot finger piers running perpendicular to the main pier.  A metal gangway ramp connected the main pier to a bulkhead on shore.  A separate pier was connected to the finger pier nearest to the shore.  Five wooden piles anchored the dock, one at the end of each finger pier with two more attached to the main pier.  Each of the finger piers served as two mooring slips, one on each side of each finger pier, with additional slips on the main float.  Triton assigned each mooring slip a letter designation.

4.  On October 6, 2006, Triton and the Ducketts executed a six-month wharfage agreement by which the Ducketts leased the "L" Slip from Triton.  One clause of the Lease Agreement provides as follows:

> MAINTENANCE. Tenant will at all times maintain the Property, including any yard and lawn, in a neat and clean condition and upon termination of this agreement will leave the property in as good condition as it is now, reasonable wear and tear excepted. . . .

Another clause of the Lease Agreement provides as follows:

> ATTORNEYS' FEES.  In the event it is necessary for either party to employ an attorney to enforce any terms of this Agreement, the prevailing party is entitled to reasonable attorneys' fees as provided

for by law.  In the event of a trial, the amount shall be as fixed by the Court.

**The Hanukkah Eve Storm of 2006**

5.    On the night of December 14 and early morning hours of December 15, 2006, Skyline Marina experienced a major regional windstorm which has come to be known as the "Hanukkah Eve Storm."  This windstorm was one of the major storms of the last half-decade in the Puget Sound region.  It produced wind gusts as strong as 90 miles per hour along the Puget Sound coast and 70 miles per hour over the Puget Sound lowlands.  For a variety of reasons, wind speeds varied widely across the Puget Sound area during the storm.

6.    Skyline Marina is protected from wind by two nearby landforms: Washington Park to the west, and Burrows Island to the south.

7.    On the night of the storm, no National Weather Service ("NWS") observation stations were located in the Anacortes, Skyline or Marine Harbor area to gauge wind speeds.  There were NWS stations at Smith Island (14 miles away), Whidbey Island Naval Air Station (10 miles away) and Friday Harbor (13 miles away), but they were not in the immediate vicinity of the Skyline Marina.  The weather observatory nearest to Skyline Marina was a private observatory at Ship Harbor that recorded data as part of the Weather Underground network.  Ship Harbor is approximately one-and-a-half miles north of Skyline Marina.  Skyline Marina is on the south side of a narrow peninsula stretching west from Anacortes.  Ship Harbor is on the north side of that peninsula.

8.    Between the hours of 1:00 a.m. and 2:00 a.m., which appears to be the general time frame of the incidents in this case, the maximum gust that the Ship Harbor observatory recorded was 43 miles per hour and the maximum sustained wind was 26 miles per hour.  Winds of that strength occur from four to ten times every year at Ship Harbor, suggesting that the winds at Ship Harbor that night were

strong, but not atypical.  Relying in large part on the data from Ship Harbor, Triton's expert, Dr. Cliff Mass, estimated the maximum sustained wind at Skyline Marina during the early morning hours of December 15 was probably 20 to 25 miles per hour, with gusts reaching approximately 40 to 45 miles per hour. Mr. Mass did not address, however, whether the data obtained from the Ship Harbor observatory was reliable.  The evidence showed that the private observatory used equipment that had not been calibrated.

9.    The Ducketts' weather expert, M.J. McDermott, estimated wind gusts as high as 76 miles per hour and sustained winds of 35 to 50 miles per hour.  She relied on data from NWS observatories that were much further from Skyline Marina than the Ship Harbor observatory.  Moreover, those observatories were in locations with materially different topographic features than Skyline Marina.

10.   The court finds that both Dr. Mass and Ms. McDermott provide helpful and credible estimates of the winds in Skyline Marina.  Both estimates, however, suffer from the limitations described above.

11.   Moreover, neither Dr. Mass nor Ms. McDermott were at the marina during the storm.  Virtually every witness who stepped outside at Skyline Marina in the early morning hours of December 16 reported extraordinary winds.  At least two of the witnesses were long-time residents in the marina, and both testified that they had never previously experienced winds of such strength.  The court recognizes that without instrumentation, these witnesses cannot reliably estimate the strength of the winds, but the court finds their descriptions of the strength of the winds relative to previous storms to be credible.

12.   Based on the expert testimony and eyewitness testimony, the court finds that the sustained winds at Skyline Marina during the events in question were between 20 and 45 miles per hour, with gusts perhaps as high as 70 miles per hour.  Winds of this strength are very rare at the marina.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW - 4**

**The Effect of the Hanukkah Eve Storm on the SEA-WY'S and the Triton Dock**

13.     Before the Hanukkah Eve Storm began, the SEA WY'S was moored in Slip L at the Triton Dock.  There were also several other vessels moored to the dock.  The SEA WY'S was secured to the dock with four mooring lines: a port bow line, a starboard bow line, a spring line and a stern line.  The mooring lines were tied to mooring cleats located on the finger pier and the main pier of the dock.

14.     The Ducketts, who were living aboard the SEA WY'S at the time, were aware of the impending storm.  Based on weather reports, Mr. Duckett returned to the marina to prepare for the storm at approximately 6:00 to 7:00 p.m.  At that time, there was no wind of significance.  In preparation for the storm Mr. Duckett checked the mooring lines, jib sheets and headsail furling mechanism to see if they were secured properly.  Mr. Duckett checked his vessel a second time before going to bed around midnight.  Despite having knowledge of an impending major wind storm, the Ducketts did not take down the headsail or take any special precautions to prevent the headsail from unfurling.

15.     Both Mr. and Ms. Duckett awoke in their bed in the forward berth of the SEA-WY'S in the early morning hours because the SEA-WY's was reacting violently to storm winds.  Mr. Duckett looked above from the forward hatch and observed the jib of the headsail coming loose from the furling system on the headstay and flapping loudly in the wind.  He described the boat as "shimmering" and "blowing broadside" in the wind.  By the time he reached the cockpit of the vessel, at least one mooring line had pulled free of the pier and the SEA WY'S was undergoing a 90-degree swing, with the bow of the boat swinging freely.  Mr. Duckett left the boat via the middle finger pier, and moved to the finger pier furthest from shore.  The bow of the SEA WY'S was either directly against the pile at the end of that finger pier, or close to it.  Mr. Duckett attempted to secure the vessel by tying a line from the bow to the pile but was unsuccessful.

16.   During this time, Ms. Duckett was below deck and frightened.  She testified that the winds were tremendous, extremely loud, and were causing the boat to pull hard on its mooring lines.

17.   Mike Lindquist, who lives near Skyline Marina, awoke around 1:00 a.m. on the night of the storm.  He visited several docks on the marina, ensuring that boats were securely moored.  He spotted the SEA-WY'S, and heard its sail flapping in the wind.  He came onto the Triton dock and moved to the end of middle finger pier and leaned against the pile.  (He remembered moving to the finger pier furthest from shore, but Mr. Duckett's testimony shows that Mr. Lindquist likely misremembered which finger pier he stood on.)  By this time, the only line securing the SEA-WYs was a stern line.  At that time, the rear starboard quarter of the SEA-WY's was within a few feet of that pile, consistent with Mr. Duckett's testimony that the SEA-WY'S had pulled free of several mooring lines and its bow had swung out at least 90 degrees, with its bow resting against the pile at the end of the far finger pier.  Mr. Lindquist helped Mr. Duckett tie a line around the pile at the end of the middle finger pier and to a cleat on the SEA-WY'S.  Almost immediately after they tied the extra line, a strong gust of wind occurred, and Mr. Lindquist heard the pile he was leaning against snap or crack. He moved off the dock as quickly as he could.  Just as he reached shore from the metal gangway, the entire Triton dock began to move, pulling the gangway into the water.

18.   About the same time as Mr. Lindquist encountered Mr. Duckett, George Springer, who lives near the shore of Skyline Marina, just to the north of the Triton dock, awoke to a loud snapping sound.  He testified that the sound was nearly as loud as a .45-caliber pistol.  He went to his own dock to make sure his boat was secure.  While there, he saw the SEA-WY'S, and saw that the loud snapping sound was from its partially unfurled headsail, which was snapping in

1    the wind.  He testified that a significant portion of the headsail was catching

2    wind, causing the SEA-WY's to list as much as 45 degrees in the wind.  He

3    testified that by this time, the entire Triton dock had shifted, and the stern of the

4    SEA-WY's was pointing at him (to the north and east of the Triton dock).  The

5    last of the mooring lines eventually broke free from the float to which it was

6    moored and their vessel came to rest on the rip rap of the shore.  Damage to the

7    Triton dock included separation of the finger piers from the main pier, the main

8    pier swinging into the channel, and the uprooting of all of the piles except one.

9    19.   Based on lay and expert witness testimony and photographs taken on the

10   morning of December 15, 2006, the court finds by a preponderance of the

11   evidence that the Ducketts' headsail unfurled at least partially and began to catch

12   wind.  Had the Ducketts properly secured the headsail, it would not have

13   unfurled.  The headsail caught wind, putting enormous forces on the SEA-WY's

14   and causing it to list as much as 45 degrees.  The force caused the SEA-WY's to

15   pull so hard on its mooring lines that they tore several mooring cleats off of the

16   Triton dock.  Mr. Duckett was able to tie at least one more line to the

17   northeasternmost pile.  The force on the sail put enough force on that pile that it

18   failed, increasing the load on other piles.  With the wind and the increased load,

19   the other piles failed as well, causing the entire Triton dock to move, enough that

20   the metal gangway connecting the dock to shore was pulled into the water.  The

21   wind on the unfurled sail continued to pull on the SEA-WYs (and therefore on

22   the Triton dock) until the last mooring line gave way.  The SEA-WYs then

23   drifted across the marina, grounding against another dock and on top of rip-rap

24   rocks near the shore.

25   20.   The Ducketts knew that windy weather was forecast for the evening of December

     14-15, 2006.  They failed to take adequate measures to secure the vessel's

     headsail.  They could have taken the headsail and furling system down from the

**FINDINGS OF FACT AND CONCLUSIONS OF LAW - 7**

headstay. Barring that, they could have taken additional measures to secure the sail inside the furler so it could not come unfurled. They also failed to take adequate measures once the headsail became unfurled in the storm.

21. As a result of the December 15, 2006 incident, the Triton dock was rendered unusable and inaccessible for moorage. The dock still has not been repaired.

22. At the time of the incident, the Triton dock had multiple moorage tenants other than the Ducketts who were no longer able to use the dock as a result of the incident. Triton had one mooring slip at an adjacent dock that was not connected to the Triton dock. That was the only slip Triton was able to continue leasing after the storm.

23. On the Ducketts' Lease Agreement's termination date of April 6, 2007, the Ducketts left "L" Slip and the entire Triton dock in a damaged or destroyed condition.

24. The Triton dock, including "L" Slip, was an adequately constructed and functioning dock system for its intended use.

25. The Ducketts contend that the mooring cleats on the Triton dock were insufficiently fastened because they were lag-bolted rather than through-bolted, and/or because the wood in which they were lag-bolted was rotten or degraded. The court finds that the Ducketts did not provide sufficient evidence to prove these contentions. To the contrary, the court finds first that if the sail had not opened, the cleats and the wood in which they were secured were more than satisfactory to secure the vessel to the dock during the storm. Even had the winds been much stronger, they would not have been strong enough to tear the mooring cleats free or break the piles had the Ducketts' headsail not come unfurled. The court finds John Hutchins' laboratory analysis of the lag bolts that were torn free from the dock persuasive. He showed that the manner in which the bolts fractured demonstrates the wood was competent enough to withstand

normal loads.  His analysis of the lag bolts shows that they were subject to repeated intense vertical and lateral loading, well in excess of any load the SEA-WY'S could have caused if its headsail had not come unfurled.

26. The Ducketts have also asserted that the piles failed for reasons other than the force applied to them by the SEA-WYs.  To support these claims the Ducketts advanced a variety of possible modes of failure including rupture, rotation in soil mass, marine borers, rot, cracking, and abrasion causing structural deficiency. The Ducketts failed to prove any of these theories by a preponderance of the evidence.  They had no direct evidence of the condition of the piles other than a single photograph taken from a distance showing one of the piles after it had been hauled onto shore.  That photograph did not establish any structural defect in the pile.  The Ducketts' expert, William Gerken, testified that he had no evidence of the strength of the piles, no information whatsoever on the depth of the piles, did not know how they failed, was not aware of eyewitness testimony that one of the piles had cracked or snapped as the SEA-WY'S pulled on it, and did not know if the piles ruptured or rotated in the soil.

27. As a final finding supporting its conclusion that the Ducketts' actions or inactions caused the damage, the court observes that there was no evidence of another boat or dock in the marina that suffered similar damage, despite the strength of the winds.  Many boats were large enough to catch substantially more wind than the SEA-WY'S, but for its sail coming unfurled.

**Property Damage to Triton Dock**

28. The Ducketts caused damage to the finger piers of the Triton dock that made them useless.  The damaged finger piers could not be repaired or reused.

29. The Ducketts caused only minor damage to the main pier of the Triton dock. That damage was repairable.

30. The Ducketts caused damage to the pilings securing the Triton dock.  Five piles could not be repaired or reused.

31. The Ducketts caused damage to the gangway connecting the main pier to the shore.  The gangway could not be repaired or reused.

32. The Ducketts also caused significant damage to the electrical system on the Triton dock, leaving the electrical system in need of complete replacement.

33. Triton proved that the cost of replacing the piles was $17,300, not including sales tax.  (The court has rounded all dollar amounts to the nearest $100.)  An additional charge of $1,500 could apply if the contractor installing the piles was forced to mobilize equipment solely for the Triton job.

34. Triton more likely than not could have avoided the $1,500 mobilization fee if it had acted promptly to repair its dock.

35. Triton proved that the cost of restoring electrical power to the dock was $12,300.

36. Triton proved that the cost of obtaining permits, engineering plans, surveys, and necessary preparatory work for repairing the dock was $7,800.

37. As of December 2009, Transpac Marinas estimated the cost of replacing the finger piers, gangway, and making necessary repairs to the main pier was $58,900, not including sales tax.  Transpac Marinas also estimated an additional cost of $5,600 to increase the quality of the gangway from private-use grade to commercial grade.

38. Triton did not prove that the gangway as it existed before the storm was of commercial grade.

39. The sales tax rate in Anacortes at all relevant times was 8.2%.

40. In March 2004, Transpac Marinas surveyed the Triton dock (under previous ownership) to determine the extent of damage from a storm event.

41. In March 2004, Transpac Marinas provided separate estimates for replacement of the main pier and the finger piers.  It recommended that the main pier be

replaced, but did not recommend replacement of the finger piers.  It found the finger piers to be in good repair, and it found no significant defects in the wood or other materials.  Considering evidence from Transpac Marinas and several witnesses who testified as to the condition of the finger piers, the court finds that the finger piers prior to the Hanukkah Eve Storm were in good condition, with no significant defects.

42.   In March 2004, Transpac Marinas estimated the cost of replacing the main pier at $25,400, and the cost for replacing the finger piers at $16,900.  Although it did not recommend the replacement of the finger piers, it noted in the estimate that there would be some cost savings from replacing those piers at the same time as the main pier.

43.   There is a significant unexplained disparity between the 2004 Transpac Marinas estimate and the 2009 Transpac Marinas estimate.  A comparison of the two estimates shows that the type of dock system recommended in each estimate is essentially the same.  Nonetheless, the 2009 cost of replacing the finger piers, gangway, and making minor repairs to the main pier was $58,900.  The 2004 cost of replacing the finger piers alone was $16,900.  Although there was no evidence to pinpoint how much of the $58,900 cost was for replacement of the finger piers alone, it is apparent that that cost would have been much more than $16,900, and much more than inflation alone would explain.

44.   Despite the disparity, the court finds no reason not to rely on Transpac Marinas' 2009 estimate of $58,900 as the cost or replacing the finger piers, gangway, and making necessary repairs to the main pier.

45.   In 2006, the finger piers were at least 25 years old, and perhaps as many as 35 years old.  Prior to the 2006 storm, the finger piers were structurally sound.

46.   The replacement finger piers that Transpac Marinas was prepared to install were significant improvements over the existing finger piers.  They used higher quality

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -**
**11**

structural materials and decking.  They were also new, and thus could be expected to last from 25 to 35 years longer than the existing finger piers.

47.    Of the $58,900 cost for replacing the finger piers, gangway, and repairing the main pier, the court awards Triton $35,000.  The court has made deductions for the depreciated value of the finger piers, and for the depreciated value of the metal gangway.

48.    Of the $17,300 cost for replacing the piles, the court awards $10,000.  The pilings were as old as the finger piers, and were made entirely of wood.  All-wood construction is no longer permitted, and the new piles would have been encased in galvanized metal.  This would be a substantial improvement over the existing piles.

49.    The court awards $69,800 for the property damage the Ducketts caused.  This includes $10,000 for replacement of piles, $12,300 for electrical work, $35,000 for the replacement of the finger piers, gangway, and repairs to the main pier.  It includes $4,700 for sales tax on those items.  It also includes $7,800 for permitting, engineering, plans, and related preparatory work.

**Triton's Lost Income Damages**

50.    Triton established that after the December 2006 storm, it had an average monthly loss of income of $1,800.

51.    Triton could have completed repairs to the Triton dock by the end of February 2008 if it had acted with reasonable diligence.  The court thus finds that Triton had fourteen months of lost income.

52.    Fourteen months of lost income at an average loss of $1,800 per month is $25,200.

53.    The Ducketts are entitled to an offset of $400 because Triton failed to refund the $400 they paid for last month's rent when they entered the Lease Agreement.

54.    The court awards lost income damages of $24,800, which includes the $400 offset.

### III.  CONCLUSIONS OF LAW

1.    The court has jurisdiction pursuant to 28 USC § 1333.

2.    Under maritime law, the owner of a vessel that breaks free from its moorings is presumptively negligent and liable for any damages it causes.  *Hood v. Knappton Corp.*, 986 F.2d 329, 331 (9th Cir. 1993) (describing the "*Louisiana* rule").  The Ducketts in this case bore the burden of rebutting the presumption by proving that they were not negligent.  They failed to do so.

3.    Even if the Triton had retained the burden of proving the Ducketts' negligence, it did so.

4.    The Ducketts raised the defense of inevitable accident or act of God.  *See Weyerhaeuser Co. v. ATROPOS ISLAND*, 777 F.2d 1344, 1347-49 (9th Cir. 1985) (recognizing "inevitable accident" and "Act of God" defense); *In re Hechinger*, 890 F.2d 202, 203, 209 (9th Cir. 1989) (recognizing "Act of God or peril of the sea" defense).  This defense applies only when "human skill and precaution, and a proper display of nautical skill," which is the equivalent of "reasonable care," could not have prevented an accident.  *Weyerhaeuser*, 777 F.2d at 134-48.  The court concludes that the Ducketts could have prevented the accident by taking reasonable care in preventing their headsail from unfurling.

5.    The court does not believe that the Ducketts asserted a laches defense at trial, but to the extent they did, they did not prevail on that defense.  The court reiterates the findings it made when it denied the Ducketts' motion in limine regarding the spoliation of evidence.

6.    Triton is entitled to judgment in the amount of $94,600 together with taxable costs.  Triton is the prevailing party on both its maritime tort and breach of

contract claims.  By the terms of the Lease Agreement, Triton is entitled to reasonable attorney fees for its breach of contract claim.

7.   Triton was entitled to withhold the $400 that the Ducketts had paid for last month's rent as an offset against its damages.  Withholding the $400 did not breach the Lease Agreement.  The Ducketts therefore do not prevail on their breach of contract counterclaim.

## IV.  ORDER

The court directs the clerk to enter judgment for Plaintiff in the amount of $94,600.  The court directs the clerk to TERMINATE this case.

DATED this 4th day of May, 2011.

The Honorable Richard A. Jones
United States District Judge

**FINDINGS OF FACT AND CONCLUSIONS OF LAW -**
**14**